

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 25, 2023

**BY ECF**
Hon. Colleen McMahon
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:    *United States v. Terrence Turner*, 22 Cr. 82 (CM)

Dear Judge McMahon:

Defendant Terrence Turner, a/k/a "Storm," the defendant,  is scheduled to be sentenced by this Court on May 2, 2023, after sustaining his fifth conviction for a narcotics offense, having participated in a narcotics conspiracy that injected kilograms of cocaine into Harlem from 2020 up to February 2022. As explained below, the Government submits that a sentence within the Stipulated Guidelines Range of 100 to 125 months imprisonment followed by three years of supervised release would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing. The Probation Department has recommended a Guidelines sentence of 100-months imprisonment. (PSR p. 22) Defense counsel has requested a probationary sentence.[1]

**I.       Background**

      **a.  The Downtown Mafia**

On February 8, 2022, a grand jury in the Southern District of New York charged Quincy Hilliard, a/k/a "Tut," Curtis Hilliard, a/k/a "Curt," Gary Brown, a/k/a "Gleme," Terrence Turner, a/k/a "Storm," Kasien Adderley, a/k/a "Kaz," Tiran Branch, Pedro Rivera, a/k/a "Dro," Derrick Latimore, a/k/a "Cone," and Antwan Andrews, a/k/a "Twan" — with  one count of conspiracy to commit cocaine and crack trafficking in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). The charges stemmed from their membership in a drug trafficking organization ("DTO") called the "Downtown Mafia" ("DTM"), which was a group of kilogram quantity cocaine traffickers and subordinates operating primarily in the vicinity of King Towers in Harlem, New York. While DTM's sales were largely concentrated in and around King Towers, members of the conspiracy also operated multiple stash houses in Manhattan and at least one stash house in New Jersey.

Q. Hilliard, C. Hilliard, Brown, and Adderley were kilogram-quantity cocaine traffickers who supplied cocaine to each other in furtherance of the DTM's operations. Turner was a dealer

---

[1] The defendant is ineligible for probation. *See* PSR ¶ 86 (citing U.S.S.G. § 5B1.1, comment (note 2)).

Hon. Colleen McMahon
April 25, 2023

who worked principally with Brown. Branch was a dealer who worked principally with Adderley and Q. Hilliard. Rivera, Latimore and Andrews were dealers who worked principally with the Hilliard brothers. The co-conspirators coordinated their narcotics activities through in-person meetings, phone communications, and Instagram chats.

Between February 2021 and February 2022, members of DTM sold approximately 1.22 kilograms of cocaine and approximately 47.598 grams of crack cocaine to a confidential source and undercover law enforcement officers engaged in the investigation of the DTM. Through other investigative techniques, including surveillance, witness information, social media communications, and phone contents, law enforcement identified an additional 47 kilograms of cocaine and 80 grams of crack cocaine involved in the conspiracy. For example, a cell phone belonging to defendant Q. Hilliard contained a video of 1232.2 grams of cocaine that was being weighed on a scale, as well as extensive narcotics-related communications with co-conspirators Latimore and Branch. As another example, the Instagram account belonging to Q. Hilliard contained conversations with co-conspirators Latimore, Brown, Andrews, Rivera and Branch in which the DTM members discussed, among other things, setting up meetings and narcotics and cash using coded language.

**b.  Relative Culpability**

Turner is the second defendant to be sentenced in this case. As set forth below, Turner is in the middle tier of culpability among the charged defendants — directly subordinate to Brown and similarly situated to Branch.

The table below reflects the Guidelines range for those defendants who have so far pleaded guilty in this case:

| Defendant | Offense Level | Criminal History Category | Guidelines Range | Mandatory Minimum | Sentence Imposed |
|---|---|---|---|---|---|
| Quincy Hilliard | 31 | IV | 151 to 188 mo. | 60 mo. | |
| Curtis Hilliard | 27 | I | 70 to 87 mo. | 60 mo. | 70 mo. |
| Gary Brown | | | | | |
| Kasien Adderley | | | | | |
| Antwan Andrews | 27 | I | 70 to 87 mo. | None | |
| Terrence Turner | 27 | IV | 100 to 125 mo. | None | |
| Tiran Branch | | | | | |
| Derrick Latimore | | | | | |
| Pedro Rivera | 27 | IV | 100 to 125 mo. | None | |

**c.  Conduct Specific to Terrence Turner**

For approximately two years, from 2020 up to February 2022, Turner worked as a cocaine dealer operating out of an apartment located at 95 Lenox Avenue ("95 Lenox") in Harlem. Turner worked directly for Brown and received resupply from Brown at 95 Lenox which Tuner then sold

Hon. Colleen McMahon
April 25, 2023

in the neighborhood around his home. In fact, at the time of his arrest near 95 Lenox, Turner was engaged in dealing drugs and was in possession of approximately 35 grams of cocaine in his backpack. Further, during a search of 95 Lenox, law enforcement recovered a bundle of a substance believed to be heroin as well as drug processing paraphernalia.

Turner's role in the scheme has been corroborated by surveillance and witness testimony. For example, on one occasion, a confidential witness ("CW-1") attempted to purchase cocaine from Turner but was unsuccessful because — as Turner explained to CW-1 —Turner was waiting for a resupply from Brown. And, on at least three occasions between on or about February 2021 and September 2021, law enforcement observed Turner receiving packages of cocaine from Brown near 95 Lenox Avenue. For example, as depicted below, on or about March 26, 2021, law enforcement watched as Turner  exited 95 Lenox and entered Brown's car while wearing a satchel. A short time later, Turner exited the car, wearing the satchel which appeared significantly heavier and thicker.

 

Pursuant to a plea agreement with the Government, the defendant pleaded guilty to a lesser included offense on December 1, 2022. The plea agreement with the Government stipulated that the applicable base offense level is 30 pursuant to U.S.S.G. §§ 2D1.1(a)(5) and 2D1.1(c)(5), because the offense involved between 5 and 15 kilograms of cocaine. No other sentencing enhancements apply. After subtracting three points for acceptance of responsibility, the resulting offense level is 27. Given that the defendant is in criminal history category IV, the parties stipulated the applicable Guidelines are 100 to 125 months imprisonment. There is no mandatory minimum applicable to the defendant. The Probation Department agrees with the calculation by the parties and recommends a 100-month term of imprisonment. Prior to his release on bail in this case, the defendant was incarcerated at the Metropolitan Detention Center ("MDC") for approximately six months.

Hon. Colleen McMahon
April 25, 2023

## II.     Discussion

### A.  Applicable Law

As the Court is well aware, although the United States Sentencing Guidelines are no longer mandatory, they provide strong guidance to courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  The Guidelines' relevance stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). After making that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to deter criminal conduct and promote respect for the law, the need to protect the public from further crimes of the defendant, and the need to avoid unwarranted sentencing disparities. *Gall v. United States*, 552 U.S. 38, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and
(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.  A Sentence Within the Stipulated Guidelines Range Is Appropriate In This Case

The Government respectfully submits that an incarceratory sentence within the Stipulated Guidelines Range is sufficient and necessary to reflect the seriousness of the conduct, to provide just punishment, and to promote general and specific deterrence.

The conduct at issue in this case is extremely serious. The defendant participated in a large-scale cocaine distribution scheme that flooded the streets of Harlem with highly addictive substances — cocaine and crack cocaine — both of which lead to devastating illness, destabilize communities, and fund vicious criminal organizations. Over the course of the scheme, the defendant worked primarily for his co-defendant Gary Brown who operated a stash house in New Jersey and transported cocaine from New Jersey into New York for resale on the streets of Harlem through individuals like Turner. Although Turner's participation in the conspiracy was more discrete than that of some of his co-defendants, it is no less serious, especially given the defendant's criminal history.

Hon. Colleen McMahon
April 25, 2023

The defendant is an experienced drug dealer who, when faced with financial pressure, chose to inject deadly drugs into the very neighborhood in which he resides, rather than rely on legitimate employment to support his family. In his own words, the defendant participated in this conspiracy for a simple, self-serving reason — he "needed money quick and fast." (Def. Sub. at Ex. 2.)  The defendant is not a young man who made a rash decision out of desperation, ignorant of the possible consequences. Quite the opposite. He is a 44-year-old man with four previous narcotics convictions, some of which resulted in serious prison terms including five-year terms in 1998 and 2007.

Although defense counsel attempts to minimize defendant's criminal history, the reality is that he has, for the last twenty-five years, been either actively engaged in trafficking narcotics or serving a sentence in connection with a narcotics conviction.[2] The defendant sustained his first two narcotics convictions in 1997, when he was 18 years old. A year later, in 1998, he was convicted of his third narcotics offense for which he received his first substantial prison term: an indeterminate term of 54 months to 9 years imprisonment. The defendant was initially released from prison in connection with his third narcotics offense in 2004 but, in 2004 and again in 2006, was returned to custody for parole violations. The defendant was released to parole for the last time in connection with his third narcotics offense on December 6, 2006. Just five months later, he was again convicted of a narcotics offense and sentenced to 90 months' imprisonment. He began a term of parole in 2013 in connection with his fourth narcotic offense. This term of parole expired in 2016. No more than four years passed before the defendant began his participation in the instant offense in 2020.

Put simply, time and time again, in exchange for little more than financial gain, the defendant injected into his community a substance that destroys lives. And he did so at a time when deaths from drug poisoning are on the rise. Between 2010 and 2018, overdose deaths involving cocaine increased by approximately 251%.[3] In 2018, New York led the nation with 1,276 deaths resulting from overdoses involving cocaine.[4] In 2019, nearly 16,000 Americans died as a result of drug overdoses involving cocaine and currently, cocaine is involved in almost one in

---

[2] In addition to the narcotics offenses described here, the defendant has also sustained multiple convictions for minor offenses, as well as a conviction for his possession of a firearm for which he was sentenced to one-year of imprisonment.

[3] *See* Drug Enforcement Administration, National Drug Threat Assessment (March 2021), *available at*  https://www.dea.gov/sites/default/files/2021-02/DIR-008-1%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

[4] *Id.*

Hon. Colleen McMahon
April 25, 2023

five overdose deaths.[5] Even short of death, the consequences of cocaine addiction can be crippling for a user: paranoia, psychosis, stroke, seizures, respiratory failure, and organ damage.[6]

Cocaine harms not just its users, but also their family and friends and the broader communities to which they belong. For this reason, major drug crimes are among "the most serious" offenses proscribed by federal law. *United States v. Dillard*, 214 F.3d 88, 101 (2d Cir. 2000); *see also United States v. Colon*, No. 10 Cr. 197 (CM), 2020 WL 4496761, at *2 (S.D.N.Y. Aug. 4, 2020) (describing cocaine as "a highly addictive drug that destroys lives, families, and communities"); *United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (describing study in preeminent medical journal in which cocaine was found to have "second-highest mean harm score of all twenty drugs [under study], after heroin").

That the defendant chose to engage in the sale of dangerous and addictive drugs for monetary benefit despite his own personal and tragic experiences with narcotics makes clear that there is a need for a serious sentence to deter the defendant from future crimes. Further, the substantial prison terms that the defendant has previously served have done little to deter him from reoffending. Right up until the moment of his arrest, the defendant was dealing drugs in his community. And although the defendant has expressed contrition to the Court, his family and those "in his corner," he has not acknowledged or expressed any remorse to the countless families in his community whose lives have been forever damaged by the drugs he dealt. *See* Def. Sub, Ex. 2.

As there is a need to deter the defendant from future crimes, so too is there a need for a serious sentence to promote general deterrence and respect for the law. Drug crimes are lucrative, and the number of individuals willing to engage in such crimes for even modest profit is, unfortunately, too high. An incarceratory sentence within the Stipulated Guidelines Range will send the message that the narcotics business is unacceptable and that purveyors of narcotics, especially repeat players like the defendant, will be punished appropriately.

---

[5] *See* Centers for Disease Control and Prevention, Drug Overdose, *available at* https://www.cdc.gov/drugoverdose/deaths/other-drugs.html.

[6] *See* National Institute on Drug Abuse, What Are the Long-Term Effects of Cocaine Use? (May 2016), *available at* https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use.

Hon. Colleen McMahon
April 25, 2023

### III.     Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the parties' stipulated guidelines range.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by:   _____
Ashley C. Nicolas/Alexander Li/Matthew J. King
Assistant United States Attorneys
(212) 637-2467